IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-337

| | |
|---|---|
| CHLOE JONES,<br><br>Plaintiff,<br><br>-against-<br><br>CAMPBELL UNIVERSITY, INC.<br><br>Respondent. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

NOW COMES Plaintiff Chloe Jones ("Plaintiff"), by her attorneys Ekstrand & Ekstrand LLP, whose offices are located at 110 Swift Avenue, Durham, North Carolina 27705, and Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleging upon knowledge with respect to himself, and upon information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1. This action is brought by Chloe Jones ("Plaintiff"), a Black, female, lesbian, disabled citizen of Darlington County, South Carolina, for damages based upon discrimination, termination and retaliation against Plaintiff for exercising her rights under 42 USC § 1981, under Title VII of the Civil Rights Act, and the American Disabilities Act with respect to compensation, terms, conditions, and privileges of employment in ways that deprive Plaintiff of equal employment opportunities and otherwise adversely affect Plaintiff's status as an employee.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter and the parties to this action pursuant to, among others, 28 USC § 1343 (3) and (4), 28 USC § 1331, and 42 USC § 2000e-5(f), this being a proceeding to enforce rights and remedies secured to Plaintiff by Title VII of the Civil Rights Act of 1964, 42 USC § 2000e *et seq.* as amended and as amended by the Civil Rights Act of 1991; 42 USC § 1981; and the Americans with Disabilities Act. The Court further has jurisdiction pursuant to 28 USC § 1332 as the two parties in the case are citizens of different states and the amount in controversy is greater than $75,000.00.

5. Venue is proper because, among other things, one of more of the discriminatory and retaliatory practices occurred within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff filed a timely charge of discrimination with the U.S. Equal Opportunity Commission (EEOC), Charge No. 433-2024-01266. The EEOC issued a Right to Sue Letter on March 25, 2024. Plaintiff filed this action within ninety (90) days of receipt of the Right to Sue Letter and has by that complied with all jurisdictional requirements and has exhausted all administrative prerequisites before initiating this action.

## PARTIES

8. Plaintiff resides in Hartsville, South Carolina. Plaintiff is a Black, lesbian female who resides in Hartsville, South Carolina. Plaintiff was forty-five years old and weighed approximately four hundred pounds while employed by Defendant. Plaintiff was subjected to race, gender, and disability discrimination, harassment, and retaliation at the hands of Defendant Campbell.

9. Plaintiff was, at all relevant times, Defendant's "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), 42 USC § 1981

("Section 1981), and the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (the "ADA").

10. Defendant is a private university in Buies Creek, North Carolina. It is a non-profit corporation, incorporated under the laws of the State of North Carolina.

11. At all relevant times herein, Defendant employed more than 15 employees.

12. Defendant is located at 143 Main St., Buies Creek, North Carolina 27506.

13. Defendant was, at all relevant times, Plaintiff's "employer" within the meaning of Title VII and the ADA.

## FACTUAL BACKGROUND

### Plaintiff Begins Employment at Defendant Palziv and Excels in His Work

14. Defendant was founded in 1887 as a private, residential, Christian liberal arts college. It is one of five universities in the State of North Carolina to achieve the highest level of accreditation, and bills itself as an "inclusive, Christian university." Defendant enrolls more North Carolinians than any other private university in the country.

15. Defendant sets forth its mission in 12 points on its website, at www.campbell.edu/About/mission. The mission includes gathering a diverse community of learners, encouraging students to think critically and creatively, and developing moral courage, social sensitivity, and ethical responsibility in its students.

### Plaintiff Participates in Extensive Hiring Process

16. Plaintiff applied for the job of Director of Residence, Life and Housing at Defendant, which is part of the Student Life Department. The hiring process was a weekend-long excursion to Defendant, with a full itinerary of meetings, including dinner with the Resident Directors; group interviews with the Housing Committee, the Student Life Leadership Team, and Student Life staff; lunch with Resident's Life professional staff; and individual interviews with

Associate Vice President of Campus Life and Title IX Coordinator Kellie Nothstine ("AVP Nothstine"), the Vice President of Student Life Dr. Dennis Bazemore, and the Vice President for Spiritual Life Faithe Beam ("VP Beam").

17. Plaintiff possessed an impressive background in residence life, including her highly-specialized Master's Degree in Student Affairs and Administration in Higher Education. She served for six years as Assistant Director of Housing and Administrative Services at Texas Women's University ("TWU"), where she managed a team of 14 who oversaw a student resident population of roughly 2,500 students.

18. While at TWU, Plaintiff had many high-profile responsibilities. Among other things, she was responsible for supervising the housing and dining operations, assisting in the development of the annual budget and presenting it to the Executive Director of Housing and Dining for final approval, and collaborating on the design and management of the first public-private partnership at TWU, involving an 874-bed residential complex and 600-seat dining hall with a project budget of $90 million. She also managed the Department of Housing and Dining's budget, collaborated with institutional partners like counseling services and the business office, and helped implement best practices as they pertain to all aspects of resident life.

19. By 2021, the Executive Director of Housing and Dining at TWU believed that Plaintiff was operating at the director level. Since no director roles were available at TWU, with the encouragement of the Executive Director, Plaintiff applied for more senior positions at other institutions.

20. On October 3, 2021, Defendant hired Plaintiff as Director of Residence, Life and Housing. Her offer of employment letter included a salary of $60,000 plus benefits including on-campus housing, which is a common benefit for this role. Defendant told Plaintiff that she would have decision-making authority for relevant programming, including the implementation of

Diversity, Equity, and Inclusion ("DEI") training, and budget development. This was a critical factor in Plaintiff's decision to accept Defendant's offer. In reality, Defendant never gave Plaintiff the promised budgetary authority.

21. At Defendant, Plaintiff reported to AVP Nothstine, a white woman. Aside from Plaintiff, the employees in the Campus Life team at Defendant were white women, none of whom were out as LGBTQ or perceived to be LGBTQ. Upon information and belief, Plaintiff was the only LGBTQ woman on the Campus Life team and one of two People of Color on the entire division.

22. On or about May 15, 2022, Plaintiff hired Marqeice Cunningham as her Assistant Director ("Assistant Director Cunningham"). Assistant Director Cunningham was the only other African American member of the Campus Life team. Assistant Director Cunningham provided oversight and management of residence hall staff and programming. She reported to Plaintiff.

**AVP Nothstine Uses African American Vernacular English
with Plaintiff, Singling Her Out Because of Her Race and Gender**

23. On August 22, 2022, Plaintiff contacted AVP Nothstine to determine whether she had missed a phone call from AVP Nothstine. AVP Nothstine replied, "Chill girl, I ain't thirsty for you."

24. A white woman referring to a well-educated African American professional woman as "girl" was demeaning, dehumanizing, and disrespectful. For context, enslaved African American females were often referred to as "girl" by their enslavers because, in the eyes of their enslavers, they did not merit having names. Plaintiff was deeply insulted that AVP Nothstine called her "girl." Further, in the dialect African American Vernacular English ("AAVE"), the term "thirsty" typically refers to romantic or sexual desire. Thus, AVP Nothstine's comment highlighted both Plaintiff's race and sexual orientation, which were common knowledge.

5

25. When African Americans speak AAVE among themselves, it imbues a sense of community in their shared identity. However, due to stereotypes surrounding AAVE – e.g., that its speakers are less intelligent – a white person speaking AAVE to an African American can leave the listener feeling judged and found wanting. It is, quite simply, condescending, cultural appropriation, and a microaggression when a white person speaks AAVE to an African American. AVP Nothstine did not speak using colloquialisms such as "ain't" or use AAVE in her everyday speech with white colleagues; by speaking AAVE to Plaintiff, AVP Nothstine was essentially talking down to Plaintiff.

26. This was not the only time AVP Nothstine used AAVE in conversation with Plaintiff. On another occasion, at a Student Life Directors' meeting, AVP Nothstine exclaimed in front of the group that Plaintiff's outfit "ate" and that she was "slaying." These are AAVE terms, referring to an outfit that was particularly good ("ate"), and indicating that Plaintiff had succeeded ("slaying"). Campus Minister Louisa Ward observed that AVP Nothstine's comments could be perceived as offensive and discriminatory, yet Defendant did nothing to curtail AVP Nothstine's offensive, discriminatory behavior.

27. Because Plaintiff feared for her job and believed that Defendant was aware of the hostile work environment created by the discriminatory harassment prepack perpetuated by AVP Nothstine, Plaintiff did not make a formal complaint to human resources did not make a formal complaint concerning AVP Nothstine's behavior. More troubling for Plaintiff, AVP Nothstine served as Defendant's Title IX Coordinator, meaning that she was in charge of ensuring that Defendant's programs did not discriminate on the basis of sex.

28. Plaintiff felt disheartened and reasonably believed that complaining about AVP Nothstine's racist behavior would be futile and/or have negative repercussions.

29. Plaintiff discussed the disparate treatment she suffered because of her race,

gender, and sexuality with fellow Black staff member, Assistant Director Cunningham. Assistant Director Cunningham and Plaintiff regularly commiserated about how inappropriate and devastating it was when AVP Nothstine appropriated Black culture and singled out Black Employees by speaking to them in AAVE. Even though AVP Nothstine was the Title IX Coordinator, and should have been the most attuned to discrimination at Defendant, she created a hostile work environment based on race at Defendant.

### **Plaintiff is Unduly Surveilled and Targeted Because of Her Severe Obesity**

30. Plaintiff suffers from severe obesity, a condition which substantially impairs, among other things, Plaintiff's ability to walk long distances. Shortly after being hired, Plaintiff notified Defendant, including AVP Nothstine, of her disability.

31. Rather than fulfilling her legal obligation not to discriminate against Plaintiff based on her disability, AVP Nothstine openly mocked Plaintiff and challenged the veracity of Plaintiff's disability. When they were scheduled for meetings, AVP Nothstine would suggest they walk during the meeting instead of meeting in an office or conference room. In or about July 2022, AVP Nothstine asked Plaintiff whether Plaintiff parked in a specific location, suggesting that Plaintiff could walk long distances if she chose to.

32. In March 2023, AVP Nothstine texted Plaintiff, "CHLOE IS WALKING," as if Plaintiff's self-ambulating were something remarkable.

33. At an off-site staff retreat, AVP Nothstine insisted that the restaurant where they had lunch reservations was "walking distance" from their retreat site. Instead, it was a considerable distance from the retreat site. When Plaintiff expressed a plan to take an Uber back to the retreat site, AVP Nothstine shamed Plaintiff, stating that she would "judge" Plaintiff if she did.

34. Plaintiff was confused and hurt by these harassing communications. She felt

dehumanized, self-conscious, alarmed, and acutely surveilled by AVP Nothstine's unnatural interest in her walking. Upon information and belief, AVP Nothstine did not send any other staff members texts concerning their weight or mobility, or make comments designed to shame them concerning their mobility.

35. Again, Plaintiff felt that she had no one to turn to with her concerns since AVP Nothstine was the very person in charge of curtailing discriminatory behavior at Defendant, yet she perpetrated the discriminatory and harassing hostile work environment. AVP Nothstine's harassment continued through the termination of Plaintiff's employment.

### Defendant Fails to Protect Plaintiff from Disparate Treatment Based on Her Race and Gender

36. On or about September 29, 2022, Plaintiff reported to AVP Nothstine several discriminatory interactions she had with Director of Facilities Andy Sneed ("Director Sneed"), a white man. Director Sneed repeatedly undermined her in meetings by cutting her off while she was speaking or raising his voice to speak over her. He adopted a commanding tone in their communications, evincing that he felt superior to her. Upon information and belief, Director Sneed engaged in these actions because he felt superior to Plaintiff because of her race and gender.

37. Plaintiff did not ever observe Director Sneed engaging in these behaviors toward white colleagues and, in fact, Plaintiff observed Director Sneed being personable and affable to his white coworkers.

38. Director Sneed's discriminatory treatment of Plaintiff hit a peak on September 29, 2022. During a normal work-related conversation, Director Sneed lunged at Plaintiff in an aggressive manner that, to Plaintiff, seemed designed to provoke a physical altercation. Plaintiff felt threatened, dehumanized, and targeted because of her race and gender. Plaintiff never saw

Director Sneed physically challenge or lunge at any of his white colleagues, or otherwise act in a similarly aggressive and threatening manner. He was only aggressive toward Plaintiff, a Black woman.

39. Plaintiff complained to AVP Nothstine about Director Sneed's behaviors towards her on several occasions. Plaintiff told AVP Nothstine that Director Sneed "either doesn't respect me because I'm Black or because I'm a woman." AVP Nothstine downplayed Director Sneed's actions, and cautioned Plaintiff that she needs to be a "good partner" with Director Sneed. Defendant did nothing to stop Director Sneed's aggressive and threatening conduct, or to address the disparate treatment to which Plaintiff was subjected due to Director Sneed's aggressive and threatening conduct.

### Plaintiff is Stereotyped as an "Angry Black Woman" and Put on a Performance Improvement Plan

40. On or about May 9, 2023, AVP Nothstine summoned Plaintiff to a meeting with herself and VP Beam, who is also a white woman. To her surprise, it was a disciplinary meeting where Plaintiff was presented with a performance improvement plan ("PIP") listing several areas for improvement. In Plaintiff's 19 months of employment with Defendant, no one at Defendant raised any of the issues set forth in the PIP with Plaintiff.

41. The issues themselves concerned Plaintiff's communication style and cast Plaintiff as the racial stereotype of the "Angry Black Woman." For example, the AVP Nothstine stated that Plaintiff yelled at staff causing them to startle, retaliated against staff and campus partners, and weaponized write-ups to bend staff to her will. AVP Nothstine's examples concerned actions taken by AD Cunningham; she did not provide examples concerning Plaintiff, except that Plaintiff would, from time to time, project her voice to communicate with someone outside her office.

42. Plaintiff came to learn that the disciplinary action was the result of a complaint by a disgruntled resident assistant whom Plaintiff disciplined for falsifying her timesheet. Instead of speaking with Plaintiff to understand the context giving rise to the resident assistant's complaint, AVP Nothstine questioned other Residence Life staff as to whether Plaintiff ever raised her voice.

43. AVP Nothstine was all too ready to embrace the stereotype that an assertive, Black woman in a managerial position is an "Angry Black Woman."

44. Plaintiff wrote a rebuttal to the PIP, pointing out the lack of factual basis to support the disciplinary action. Plaintiff specifically denied raising her voice to subordinates and the baseless retaliation claims.

45. Tacitly acknowledging the truth of Plaintiff's rebuttal, AVP Nothstine tore up the PIP and threw it out.

46. Upon information and belief, Defendant created the PIP to support a pretext for terminating Plaintiff's employment because she is a Black woman, and in retaliation for her having complained about the discriminatory behavior of Director Sneed.

### AVP Nothstine Launches Retaliatory Survey to Humiliate
### Plaintiff and Support Pretext for Terminating Her Employment

47. As part of the abandoned PIP, AVP Nothstine decided to survey Plaintiff's peers and subordinates concerning the environment, support, and morale in Plaintiff's department. The survey prepared by AVP Nothstine, however, was a series of leading yes/no questions that would not provide any shaded quantitative data, nor any qualitative data from which anyone could glean specific areas for improvement.

48. Plaintiff rewrote the survey to be less biased and elicit more useful information, and sent it out herself to mask the punitive reason for its creation. Nevertheless, none of AVP

Nothstine's other direct reports were subjected to performance surveys.

49. Upon information and belief, Defendant instituted the survey of Plaintiff's performance to support a pretext for terminating Plaintiff's employment because she is a Black woman, and in retaliation for her having complained about the discriminatory behavior of Director Sneed.

### AVP Nothstine Retaliates Against Plaintiff by Moving Her Offices to a Location Less Accessible to Students

50. The offices for Plaintiff's Residence, Housing & Life Department were located near about 75% of the residential community at Defendant. This made it easy and convenient for the student residence to have their needs met.

51. In the late Summer of 2023, AVP Nothstine announced that Plaintiff's departmental offices were being moved to the same building where she is located because Defendant wanted all Student Life offices to be in the same area. The new location was far from the student dormitories. AVP Nothstine also claimed that Plaintiff's offices had a mold problem, hastening the need to move.

52. Upon information and belief, AVP Nothstine initiated the move so she could keep a closer watch over the Plaintiff: the only Black person in Student Life leadership. AVP Nothstine and her assistant, Judy Tunstall, made frequent visits to Plaintiff's department for no apparent reason other than to check whether anyone was present. This happened so frequently that AD Cunningham commented to Plaintiff, "This feels uncomfortable."

53. Upon information and belief, AVP Nothstine moved Plaintiff's department in retaliation for her opposing the racially motivated PIP and opposing the discriminatory behavior of Director Sneed. Indeed, soon after the move, AVP Nothstine spoke of moving the Counseling Department to Residence, Housing and Life's old offices. There was no talk of remediating the

11

supposed mold infecting the area.

### AVP Nothstine Opposes Plaintiff's Hiring of DEI Trainer to Support Pretext for Terminating Plaintiff's Employment

54. Each year, the student residence assistants at Defendant undergo Diversity, Equity, and Inclusion ("DEI") training, and it was the responsibility of Plaintiff's department to organize the training. The training is scheduled several months in advance to ensure that the required speakers and participants are available.

55. In 2023, planning for the DEI training scheduled for the Summer began in March or April.

56. Plaintiff invited a skilled trainer who is part of Defendant's community for the training, but he never responded to her requests. As it would not be possible to reschedule the DEI training, Plaintiff hired someone from outside Defendant's community to fill the role.

57. Before she was hired, Defendant told Plaintiff that she had budgetary authority over DEI training. Moreover, she hired DEI trainers in the past without AVP Nothstine's approval or comment, so she did not think to check with AVP Nothstine when she hired a trainer for the Summer 2023 training. The prior trainings occurred before Plaintiff complained about Director Sneed's discriminatory behavior.

58. Notwithstanding Defendant's representations and past practice, AVP Nothstine used Plaintiff's failure to check with her before hiring the DEI trainer as a reason for terminating Plaintiff's employment.

### AVP Nothstine Uses Athlete Move-In Weekend As a Pretext to Support the Termination of Plaintiff's Employment

59. Defendant is a NCAA Division 1 school. Student athletes move in before the rest of the student body, and the move in process can be chaotic as the Athletics Department makes offers to prospective students up to the move in dates. Accordingly, the Athletics Department

sends its list of athletes at the last-minute, leaving little time for Residence, Housing and Life to coordinate their housing needs. The situation is fluid by design.

60. Plaintiff was not scheduled nor required to work during the Fall 2023 athlete move-in weekend, but decided to work anyway to help minimize disorder and to be available to her staff to handle issues as they arise.

61. AVP Nothstine cited disorder during the athletes move-in weekend as a reason for terminating Plaintiff's employment.

### AVP Nothstine Terminates Plaintiff's Employment

62. On July 31, 2023, the Monday following the athletes move-in weekend, AVP Nothstine terminated Plaintiff's employment. AVP Nothstine gave the following reasons for terminating Plaintiff's employment: (a) Plaintiff created a hostile work environment for her white staff; (b) Plaintiff misused funds when she hired a DEI trainer; and (c) Plaintiff mishandled the athlete move-in weekend.

63. Upon information and belief, Defendant reasons for terminating Plaintiff's employment were pretextual. Upon information and belief, Defendant terminated Plaintiff's employment because of her race and gender, as a Black woman.

### COUNT I
### DISCRIMINATION - TITLE VII OF THE CIVIL RIGHTS ACT

64. Plaintiff incorporates herein by reference paragraphs 1 through 48 of this Complaint.

65. Defendant discriminated against Plaintiff in violation of the Title VII by subjecting her to different treatment on the basis of her race, color, and gender.

66. Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

67. Defendant further discriminated against Plaintiff by subjecting her to a hostile work environment on the basis of her race, color, and gender.

68. Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated, white, male employees and by subjecting her to disparate terms and conditions of employment and other forms of discrimination on the basis of her race, color, and gender in violation of Title VII.

69. The conduct of Defendant was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

70. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

71. As a result of Defendant's violation of Title VII, Plaintiff has been damaged in the sum of no less than $2,500,000

## COUNT II
## RETALIATION – TITLE VII OF THE CIVIL RIGHTS ACT

72. Plaintiff incorporates herein by reference paragraphs 1 through 55 of this Complaint.

73. Plaintiff was an employee of Defendant and is protected by Title VII from retaliation and retaliatory discharge.

74. Plaintiff complained to Defendant about the race, color, and gender discrimination she was subjected to during her employment with Defendant.

75. Plaintiff notified Defendant of the race, color, and gender discrimination she was subjected to and protested the harassment.

76. Plaintiff's opposition to the race, color, and gender discrimination she was subjected to by Defendant during her employment with Defendant was a protected activity under Title VII.

77. Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race, color, and gender discrimination.

78. Because she protested Defendant's unlawful behavior, Plaintiff was subjected to retaliation and wrongfully terminated from Defendant.

79. The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of Title VII and would have had the effect of dissuading any employee from opposing the race, color, and gender discrimination rampant at the workplace.

80. The conduct of Defendant was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

81. By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

82. As a result of Defendant's violation of Title VII, Plaintiff has been damaged in the sum of no less than $2,500,000.

**COUNT III**
**DISCRIMINATION – 42 U.S.C § 1981**

83. Plaintiff incorporates herein by reference paragraphs 1 through 251 of this Complaint.

84. Defendant has discriminated against Plaintiff in violation of 42 U.S.C. § 1981 by subjecting her to different treatment on the basis of her race. Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

85. Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white, male employees and by subjecting her to disparate terms and conditions of employment, including termination and a hostile work environment, and other forms of discrimination on the basis of her race in violation of 42 U.S.C. § 1981.

86. The conduct of Defendant Mom's Organic was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

87. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981.

88. As a result of Defendant's violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $2,500,000.

## COUNT IV
## RETALIATION – 42 U.S.C. § 1981

89. Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

90. Plaintiff has been retaliated against in response to her participation in proceedings and activities protected by § 1981, as well as to his opposition of the practices of Defendant, which violate § 1981.

91. As a result of Defendant's violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $2,500,000.

## COUNT VI
## DISCRIMINATION– AMERICANS WITH DISABILITIES ACT

92. Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

93. Plaintiff is disabled as she has limited mobility and is unable to walk long distances.

94. Plaintiff was able to perform the essential functions of this position with or without a reasonable accommodation.

95. Defendant treated Plaintiff worse than similarly situated non-disabled employees on the basis of her disability.

96. As a result of Defendant's violation of the ADA, Plaintiff has been damaged in the sum of no less than $2,500,000.

## JURY TRIAL REQUESTED

135. Plaintiff requests a trial by a jury of his peers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court that it:

1. Enter a declaratory judgment that the practices complained of herein are unlawful and in violation of plaintiff's rights;

2. Permanently enjoin the Defendant from engaging in said unlawful practices, policies, customs, and usages set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

3. Reinstate Plaintiff;

4. Award plaintiff compensatory damages for pecuniary losses, emotional pain, and mental anguish, together with attorneys' fees and the costs and disbursements of this action;

5. Award Plaintiff punitive damages;

6. Award Plaintiff back pay with prejudgment interest, and affirmative relief necessary to eradicate the effects of the unlawful employment practices;

7. Grant Plaintiff a jury trial on all issues of fact, and;

8. Grant such other relief the court deems just and proper.

Respectfully submitted this 18th Day of June, 2024 by:

/s/ Robert Ekstrand

Robert Ekstrand
N.C. Bar No. 26673
Ekstrand & Ekstrand LLP,
110 Swift Avenue, Second Floor
Durham, North Carolina, 27705
Telephone: (919) 416-4590
Facsimile: (919) 214-3014
Email: rce@ninthstreetlaw.com


/s/ Megan S. Goddard

Megan S. Goddard
*Special Appearance Application Forthcoming*
Goddard Law PLLC
39 Broadway, Suite 1540
New York, New York 10006
Telephone: (646) 964-1178
Facsimile: (212) 208-2914
Email: Megan@goddardlawnyc.com

*Attorneys for Plaintiff*